NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

DANA T. TOKLEY,

    *Petitioner*,

  v.

              Civ. Action No. 09-4546  (KSH)

MICHELLE RICCI, Administrator of New
Jersey State Prison, and PAULA T. DOW,
Attorney General for the State of New Jersey,      **OPINION**

    *Respondents*.

---

**<u>Katharine S. Hayden, U.S.D.J.</u>**

   This matter comes before the Court on petitioner Dana Tokley's petition for habeas corpus relief pursuant to 28 U.S.C. § 2254.  In New Jersey state court, a jury convicted Tokley of first-degree armed robbery and second-degree possession of a firearm for an unlawful purpose. The trial court granted the state's motion for an extended term and sentenced Tokley to 55 years with 27.5 years of parole ineligibility consecutive to the sentence he was already serving.  The Appellate Division affirmed the conviction, and the New Jersey Supreme Court denied certification.  Tokley filed a petition for post conviction relief (PCR) on grounds that he received ineffective assistance from counsel.  After an evidentiary hearing, the PCR petition was denied. That decision was affirmed on appeal.  Having exhausted his state court remedies, Tokley petitioned this Court for habeas corpus relief seeking a new trial on the grounds that the Appellate Division's denial of the PCR petition was an objectively unreasonably application of

1

federal law, and the Appellate Division's affirmance of his conviction on direct appeal was contrary to clearly established federal law.

## I.   Factual Background

The pertinent facts are taken from the opinion of the Appellate Division affirming Tokley's conviction.  On November 11, 1996, Jose Martinez and another man he later identified as Tokley held up Quality Automobiles, a car dealership in Pennsauken, New Jersey.  (Pet'r's Br. App., *State of New Jersey v. Tokley*, Appellate Division, Docket No. A-4725-99T4, Ba 2.) Martinez was the state's key witness at Tokley's trial.  (*Id.* at Ba 3.)   He testified that he, Tokley, and a third man, Elliot Rosario, planned to rob Quality Automobiles, but on the night in question, Rosario did not participate.  (*Id.*)  According to Martinez, he and Tokley, both armed and masked and dressed in camouflage clothing, drove to the Quality car lot.  (*Id.*)  Martinez entered the trailer and instructed the women inside to lie down on the ground while Tokley concentrated on the manager, who they believed was carrying significant cash.  (*Id.*) According to the manager, Robert Owens, one of the masked men, presumably Tokley, instructed him to "give me the money," and took $900 from him at gunpoint.  (*Id.* at Ba 2.)  Owens was told to open the safe, but when he explained that there was no safe, Martinez instructed his accomplice to shoot Owens.  (*Id.* at Ba 3.)  There were no shots fired; Martinez grabbed a pocketbook from one of the women; and both masked men fled the scene. (*Id.*)

Martinez was the only witness at Tokley's trial to identify Tokley as the masked gunman. (*Id.*)   In his testimony, Martinez explained in detail how the armed robbery took place and said that he knew Tokley from prior criminal activities. (*Id.*)  At the time he testified against Tokley, Martinez was serving a 20 year sentence for aggravated manslaughter, and Rosario had been murdered.  (*Id.*) Martinez said he agreed to cooperate with the government and testify in

exchange for a lesser charge and because he was upset his friend Rosario had been killed and he had concerns that he might also be killed.[1] (*Id.* at Ba 2–Ba 3.)  Tokley's defense counsel, Scott Griffith, vigorously cross-examined Martinez about his long criminal history, his hatred of Tokley, and his discussions with others about killing Tokley, in order to impeach his testimony. (*Id.* at Ba 4–5.)  On redirect, Martinez began to more fully explain his relationship with Rosario, whom he described as like a brother. (*Id.* at Ba 5.)  He said he was very angry with Tokley because he had influenced Rosario to kill someone in a prior drug transaction and that person turned out to be the "wrong guy." (*Id.*) As a result of this, Martinez testified that if he could get away with it, he would have killed Tokley. (*Id.*)  Martinez then blurted out that Tokley had killed Rosario in front of him.  (*Id.*)  Griffith immediately objected and requested a mistrial. (*Id.*)  After discussions at sidebar, the court overruled the objection and denied the request for a mistrial and instead gave a limiting instruction to the jury as follows:

> Ladies and gentlemen of the jury, you just heard the witness, Jose Martinez, testify that he has enormous animosity towards Dana Tokley because Dana Tokley shot and killed his, I guess, best friend, Elliot Rosario.
>
> I have overruled the objection to that testimony and I will allow you to consider it. But, I want you to consider it for a very limited purpose.  And that is, for the limited purpose of deciding the credibility and believability of Jose Martinez' testimony about Dana Tokley's participation in the Quality Auto robbery.
>
> In other words, you are entitled to consider whether this witness has so much animosity towards Dana Tokley because of the alleged death of Elliot Rosario that he would falsely implicate Dana Tokley in the robbery of Quality Auto.

---

[1] Martinez was charged with murder in an unrelated case and was eligible for a life sentence due to his prior criminal activity. (Pet'r's Br. 1.)  Martinez agreed to testify for the State pursuant to a plea agreement in which he confessed to committing the Quality Automobiles robbery with Tokley. (*Id.*)  In exchange for his plea and trial testimony against Tokley, the State agreed to a 20 year sentence for aggravated manslaughter on the murder charge, with eight years of parole ineligibility. (*Id.*) Because the sentence was made concurrent with Martinez's other sentences, by the time he testified in Tokley's trial he was eligible for parole in five years. (*Id.* at 2.) Martinez was released from custody in April of 2005 and was never charged in the Quality Automobiles robbery. (*Id.*)

> But, bear in mind that Mr. Tokley is not on trial here for the murder of Elliot Rosario and you should not hold that statement against him. You should not assume that because this witness is saying that Dana Tokley killed Elliot Rosario you should certainly not conclude that he did so.
>
> You are to consider the statement for the limited purpose and for only one purpose and that is in deciding whether it may give the witness, Jose Martinez, a motive to falsely implicate and falsely accuse Dana Tokley in the robbery at Quality Auto on November 11, 1996.
>
> So, we are here to decide whether the State has proven Dana Tokley guilty beyond a reasonable doubt of the armed robbery at Quality Auto. You are certainly not here to decide whether Dana Tokley is guilty of murdering Elliot Rosario.

(*Id.* at Ba 5–6.)  Neither the prosecutor nor defense counsel objected to the instruction. (*Id.* at Ba 6.)  Before continuing with Martinez's testimony, the court further clarified its instructions:

> Ladies and gentlemen, before Mr. Martinez resumes the stand, let me just add one thing to the limiting instruction I gave you a few minutes ago. I think it was implicit in what I said. I want to make it explicit. The testimony Mr. Martinez gave about Mr. Tokley allegedly killing Elliot Rosario, you should not assume from that that Mr. Tokley has a propensity to commit crimes or that he's a bad person or an unlawful person in any way. Again, it's for the limited purpose of evaluating the motive of the witness, Jose Martinez, to be truthful or not truthful.

(Resp't's Br. 87.)

Tokley appealed his conviction alleging numerous trial errors, including, not surprisingly, the court's failure to grant a mistrial after Martinez's outburst, arguing among other things that he was denied a fair trial.  (Pet'r's Br. App., *State of New Jersey v. Tokley*, Appellate Division, Docket No. A-4725-99T4, Ba 2.)  The Appellate Division focused on the issue of how the trial court handled Martinez's outburst, analyzed the trial court's rulings on evidentiary grounds, and affirmed, concluding that there was no reversible error.  (*Id.*)  The New Jersey Supreme Court denied certification, and Tokley timely filed for post-conviction relief.

His PCR petition argued ineffective assistance of counsel on a variety of issues, and sought a new trial based on newly discovered evidence.  The trial court held an evidentiary hearing at which Tokley, his trial lawyer, and others testified.  Tokley  raised  five grounds for relief, arguing that his lawyer failed: (1) to investigate or call witnesses that could demonstrate an alibi and support third-party guilt; (2) to request the model accomplice liability jury charge; (3) to cross-examine Martinez on his inconsistent statements about certain critical issues; (4) to request a *Bielkiewicz* instruction; and (5) to object to the admission of hearsay evidence that was the State's only means of proving motive. (Pet'r's Habeas Petition, *State v. Tokley*, Appellate Division PCR Opinion, A-6536-05T4, Pa 39–40.)

Much of the PCR evidentiary hearing involved Tokley's claim that his lawyer had not investigated, interviewed and called specific witnesses.  Tokley testified at the hearing that he could not have committed the robbery on November 11th, 1996 because the 11th was Veteran's Day and he had gone with his mother and his aunt to the cemetery where his brother, a veteran, was buried. (Resp't's Br. App., Rta 9 at 51:14–52:22.)   Tokley argued that his mother, had she testified at his trial, would have provided an alibi.  Although Tokley had asked Griffith to interview his mother, it became clear from the testimony that Tokley had never told Griffith about a trip to the cemetery on November 11th or the fact that his mother was with him.  (*Id.* at 99:5–101:6; 102:6–12.)  Tokley's mother, Carol Tokley, testified that she was at the cemetery with Tokley on November 11th, but that she did not know that it was the date of the robbery until she was attending his trial. (*Id.* at 61:22–63:8.)  During the trial she had lunch with Griffith and asked if she could testify, but she admitted at the PCR hearing that she had never told Griffith what she wanted to testify about, or mentioned the trip to the cemetery. (*Id.* at 63:21–64:19.)

Tokley's sister, Marcella McDonald, testified that on the day of the robbery, she heard Ernest Hill, also known as "E-Train," tell her husband that "he robbed . . . the car place," and that they would see it "in the paper the next day." (*Id.* at 7:18–9:3.)  An article about the Quality Automobiles robbery did appear in the *Courier-Post* on November 12th. (*Id.* at 9:1–3.) McDonald also testified that no one ever contacted her about the trial and she did not "even know about the trial" until her mother asked her to attend the sentencing in April of 2000. (*Id.* at 11:1–13:11.)  She stated that it was at the sentencing that she realized her brother was being sentenced for the same robbery that E-Train had previously admitted to. (*Id.* at 13:12–15:13.) On the basis of this testimony, Tokley argued that had Griffith interviewed his sister and learned about E-Train's remark, he would have been able to call her as a witness to provide evidence of third-party guilt. Griffith, for his part, said that he would not have called her because she did not appear credible and her testimony would have been of little value. (Resp't's Br. App., Rta10 at 70:6–17; 73:9–74:6.)  Generally, Griffith testified that although Tokley had provided him with a list of witnesses he wanted interviewed, he did not choose to interview or call them as witnesses because his trial strategy was focused on discrediting Martinez. (Resp't's Br. App., Rta10 at 63:15–65:9; 70:6–71:1.)

The trial court found that it was objectively unreasonable for Griffith to fail to interview witnesses because no court "can really ever condone or excuse away or justify in any way, shape, or form the failure to interview witnesses." (Resp't's Br. App., Rta11 165:11–17.)  However, the court concluded that Tokley was not prejudiced because neither witness's testimony was credible. (*Id.* at 178:1–181:7.)  The court determined that Mrs. Tokley had not intentionally testified falsely, and had likely taken a trip to the cemetery with her son, but she appeared confused about the date of the cemetery trip. (*Id.* at 173:12–174:1.)  Further, the court reasoned

that had Tokley actually been at the cemetery with his mother on the date of the robbery he would have mentioned this fact to his lawyer at least once; yet in the 30 letters Tokley sent to Griffith before the trial, the cemetery trip was never mentioned.  (*Id.* at 174:2–175:21.)  The court concluded, therefore, that even if Griffith had interviewed Mrs. Tokley he would not have learned about the cemetery trip alibi, because "it was something that was conceived and thought of after the unfortunate verdict."  (*Id.* at 178:5–9.)

With respect to Tokley's sister Marcella McDonald, the court found that she would not make a convincing trial witness. (*Id.* at 179:1–9.)  Moreover, the court noted that the issue of third-party guilt, in that E-Train was the actual perpetrator, was brought to the jury's attention by Griffith during trial.  (*Id.*) Therefore, the failure to interview and call McDonald would not have made a difference because "A, her demeanor was not the best, and B, the issue was already presented to the jury in any event."  (*Id.* at 180:5–6.)   Finally, the court rejected Tokley's other arguments for ineffective assistance of counsel, finding many of Griffith's other alleged failures to be valid trial strategies. (*Id.* at 181:8–186:1.)

The Appellate Division affirmed these rulings, finding that the trial judge had properly applied the standard articulated in *Strickland v. Washington,* 466 U.S. 688 (1984), and that Tokley's claims for ineffective assistance of counsel did not satisfy the standard.  (*Id.* at Pa 41.) Tokley then timely filed this petition challenging the constitutionality of his conviction.

## II.  Standard of Review

Section 2254(a) of Title 28 of the United States Code gives the Court jurisdiction to entertain a habeas petition challenging a state conviction or sentence where the inmate's custody violates federal law. 28 U.S.C. § 2254(a).   The Anti-Terrorism and Effective Death Penalty Act (AEDPA) limits a federal court's authority to grant habeas relief when a state court has

adjudicated petitioner's federal claim on the merits.  In such cases, the writ must be denied unless the state court's adjudication of the claim (1) involved an unreasonable application of clearly established Federal law, (2) was contrary to clearly established Federal law, or (3) was based on an unreasonable determination of the facts in light of the evidence before the state court. *See* 28 U.S.C. § 2254(d).

Pursuant to § 2254(d)(1),  "[a]n 'unreasonable application' occurs when a state court 'identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts' of petitioner's case." *Rompilla v. Beard*, 545 U.S. 374, 380 (2005) (quoting *Wiggins v. Smith*, 539 U.S. 510, 519, 520 (2003)).  *See also Rountree v. Balicki*, 640 F.3d 530, 537 (2011).  "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Lockyer v. Andrade,* 538 U.S. 63, 75–76 (2003).  "Rather, '[t]he state court's application of clearly established law must be objectively unreasonable' before a federal court may grant the writ."  *Rountree*, 640 F.3d at 537 (quoting *Andrade,* 538 U.S. at 75).  In essence, the AEDPA "precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."  *Harrington v. Richter,* --- U.S. ---, 131 S. Ct. 770, 786 (2011) (quoting *Yarborough v. Alvarado,* 541 U.S. 652, 664 (2004)).

A state court decision is "contrary to" clearly established federal law under § 2254(d)(1), where it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or if it confronts a set of facts that is materially indistinguishable from a decision of [the Supreme] Court but reaches a different result." *Brown v. Payton,* 544 U.S. 133, 141 (2005). Pursuant to § 2254(d)(2), an "unreasonable determination of facts" occurs where "the petitioner

has demonstrated by clear and convincing evidence that the state court's determination of the facts was unreasonable in light of the record." *Id.* at 547–38 (internal quotations omitted). *See* § 2254(e)(1); *Rice v. Collins,* 546 U.S. 333, 338–39 (2006).   Reasonableness is measured by looking to the record of the evidence at the time of the state court's adjudication.  *Id.* at 548.

Tokley argues that the Appellate Division's affirmance of the PCR Court decision amounted to an objectively unreasonable application of the Supreme Court's *Strickland* standard for ineffective assistance of counsel. (Pet'r's Br. 4.)  Tokley further argues that the Appellate Division's decision on direct appeal was contrary to the Supreme Court's decision in *Boyle v. California,* 494 U.S. 370, 380 (1990).

## III.  Discussion

### A.  Ineffective Assistance of Counsel Claims

In his petition, Tokley alleges that the Appellate Division's rejection of his *Strickland v. Washington* claims for ineffective assistance of counsel was an objectively unreasonable application of the Supreme Court's precedent.   Under *Strickland*, the court must consider "whether counsel's performance was deficient, and if so, whether it prejudiced" the petitioner. *Brown v. Wenerowicz,* --- F.3d ---, No. 10-3203, 2011 WL 6091408, at *9 (3d Cir. Dec. 8, 2011). With respect to the first prong, counsel's performance is deficient or ineffective when it falls "below an objective standard of reasonableness." *Strickland,* 466 U.S. at 688. Tokley's burden in the PCR proceedings was to demonstrate that in light of the facts of the case as viewed by counsel at the time of the complained of incident, counsel's conduct fell "outside the wide range of professionally competent assistance." *Id.* at 690.  As to the second "prejudice" prong, Tokley was required to establish that there was "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.   It is

not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." *Harrington,* 131 S. Ct. at 787. Rather, Tokley must have shown that counsel's errors were "so serious as to deprive [him] of a fair trial." *Id.* at 787–88.

"The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, the review is doubly so." *Harrington,* 131 S. Ct. at 788 (internal quotations and citations omitted). Thus, the court is "not authorized to grant habeas corpus relief simply because [it] disagrees with the state court's decision or because [it] would have reached a different result if left to [its own] devices." *Werts v. Vaughn,* 228 F.3d 178, 197 (3d Cir. 2000). If "fairminded jurists could disagree" on the correctness of the Appellate Division's decision, its holding must be affirmed. *Alvarado,* 541 U.S. at 664.

Tokley's petition alleges that the Appellate Division unreasonably applied *Strickland* in assessing all five grounds for ineffective assistance of counsel he raised in the PCR proceeding: that counsel failed (1) to investigate or call witnesses that could demonstrate an alibi and support third-party guilt; (2) to request the model accomplice liability jury charge; (3) to cross-examine Martinez on his inconsistent statements about certain critical issues; (4) to request a *Bielkiewicz* instruction; and (5) to object to the admission of hearsay evidence that was the State's only means of proving motive. Each will be addressed in turn.

### 1. Failure to investigate or call witnesses.

Tokley prevailed on the first *Strickland* prong in front of the PCR court, which concluded that Griffith's failure to interview any witnesses was objectively unreasonable. The Appellate Division agreed, and Tokley does not challenge this conclusion. The remaining issue, then, is whether the Appellate Division unreasonably concluded that Tokley failed to satisfy the prejudice prong.

10

Tokley argues that had his mother been interviewed by Griffith as he had requested, she could have provided alibi evidence by testifying that he was at the cemetery on the date of the robbery.   He claims that because Griffith failed to interview his mother and thus did not present evidence of his alibi, there is a reasonable probability that doing so could have resulted in a different outcome.   Similarly, Tokley argues that if his sister had been called she could have presented evidence of third party guilt that could have reasonably resulted in a different outcome.

Tokley argues that the PCR judge improperly relied on her own determinations of the witnesses' credibility and the Appellate Division's affirmance was thus an objectively unreasonable application of the prejudice prong.   (Pet'r's Br. 5.)   While the judge did make credibility determinations when assessing the testimony of both Mrs. Tokley and McDonald, doing so is inherent in the prejudice analysis and the cases Tokley relies on do not provide authority to the contrary.   The trial court's conclusion that Tokley was not prejudiced by the failure to interview either witness was based on the totality of the circumstances presented at the PCR hearing and whether or not there was a reasonable probability that conducting such interviews would have affected the outcome of the trial.   In affirming the PCR court's conclusions, the Appellate Division similarly determined Tokley was not prejudiced due to a confluence of facts and circumstances.

With respect to the proposed alibi testimony Mrs. Tokley could have given, the Appellate Division, in accord with the findings of the PCR court, concluded that even if Griffith had interviewed Mrs. Tokley he likely would not have elicited information about the trip to the cemetery.   Therefore, it reasoned that Tokley was not prejudiced because the alibi would not have come to light.   This is not an objectively unreasonable conclusion because neither Tokley nor his mother told Griffith that she had alibi testimony to offer either before or during the trial.

11

(Pet'r's Habeas Petition, *State v. Tokley*, Appellate Division PCR Opinion, A-6536-05T4, Pa 43–44.)

Further, in the numerous letters Tokley sent to Griffith prior to his trial he never once mentioned the cemetery or the fact that he was with his mother at the time of the robbery. (*Id.* at Pa 44.)  Moreover, the Appellate Division pointed to a letter Tokley wrote to Griffith after his trial, stating that Griffith did "a good job" representing him, which it found to be inconsistent with Tokley's present claim that Griffith blatantly failed to investigate, interview or call a potential alibi witness. (*Id.* at Pa 44.)  Finally, the Appellate Division paid "particular deference" to the PCR court's determination that Mrs. Tokley "was a nice person but that her memory was not reliable." (*Id.* at Pa 41–44.)  Based on this culmination of facts and circumstances, it cannot be said that the Appellate Division was objectively unreasonable in concluding that Griffith's failure to interview Mrs. Tokley was not prejudicial or so egregious as to deprive Tokley of a fair trial.

The Appellate Division also found the PCR court's conclusion that McDonald's testimony would have been cumulative and unhelpful to be reasonable in light of the circumstances.  (*Id.* Pa 42–45; Resp't's Br. App., Rta11 179:1-9.)  It noted that Griffith had no recollection of McDonald ever being mentioned as a possible witness, and the letter he received from Tokley on November 23, 1999 listing witnesses he wanted interviewed included his mother, Carol Tokley, but did not mention his sister, McDonald. (Pet'r's Habeas Petition, *State v. Tokley*, Appellate Division PCR Opinion, A-6536-05T4, Pa 45; Resp't's Br. 27.)  The Appellate Division also credited Griffith's statement that even if he had known about McDonald, he would not have called her because after observing her testify at the PCR hearing he did not believe she would have been a credible witness.  (Pet'r's Habeas Petition, *State v. Tokley*,

Appellate Division PCR Opinion, A-6536-05T4, Pa 45.)  Throughout her testimony she contradicted herself numerous times, particularly in describing when she became aware that Tokley had been charged with the Quality Automobiles robbery.  (Resp't's Br. App., Rta9 24:20–30:25.)

In any event, Griffith also testified that Tokley told him rather early on that E-Train was the person responsible for the robbery, and the PCR court took pains to note that Griffith did present the issue of third party guilt to the jury by arguing that E-Train was the actual perpetrator. (Resp't's Br. App., Rta10 65:11–66:4, Rta11 179:1–9.)  The Appellate Division credited Griffith's testimony that he chose not to subpoena or call E-Train because he believed he would exercise his Fifth Amendment right against self-incrimination. (*Id.* at Pa 44.)  The court found this was a valid trial strategy.  Thus the Appellate Division concluded, not unreasonably, that the failure to offer McDonald's testimony did not prejudice Tokley.

Tokley argues that the Appellate Division's decision was objectively unreasonable because a jury *could* have found the witnesses credible and that could have changed the outcome of the trial. (Pet'r's Br. 17.)  But the mere fact that a jury *could* have credited them does not mean that there is a reasonable probability they would do so. "Speculation is not enough under the AEDPA. The [Appellate Division's] determination must necessarily be unreasonable." *Brown,* No. 10-3203, 2011 WL 6091408 at *13.  Because "fairminded jurists could disagree," the Appellate Division's decision does not amount to an objectively unreasonable application of the prejudice prong of the *Strickland* standard.  *Alvarado,* 541 U.S. at 664.

### 2.  Counsel's failure to request the model accomplice liability jury charge.

Tokley argues that Griffith's failure to request the model jury charge on accomplice liability was prejudicial because it would have required the jury to apply strict scrutiny to

Martinez's testimony.   (Pet'r's Br. 18.)   The accomplice testimony model jury charge in pertinent part states:

> The law requires that the testimony of [an accomplice] witness be given careful scrutiny.  In weighing (his/her) testimony, therefore, you may consider whether (he/she) has a special interest in the outcome of the case and whether (his/her) testimony was influenced by the hope or expectation of any favorable treatment or reward, or by any feeling of revenge or reprisal.

(*Id.* at 19.)

At trial, the judge asked Griffith if he was requesting any specific jury charges. (*Id.* at 19.)  Griffith said he had not drafted a specific charge and he did not ask for the model charge, but he said he would like to include a charge that instructed the jury that it "must" view Martinez's testimony with caution because of his agreement with the state. (*Id.* at 20–21.)  The judge said she would not issue a charge that instructs the jury that they "must" do something because it intrudes on the fact-finding role, but explained that the standard charge on witness credibility already tells the jury to evaluate credibility by taking into account "the witness' interest in the outcome of the trial, if any; the possible bias, if any, in favor of the side for whom the witness testified; whether the witness testified with the intent to deceive [the jury]; and any and all other matters in the evidence which serve to support or discredit his or her testimony before [the jury]." (*Id.* at 21.)  Griffith agreed that such a charge would be sufficient as long as the Court would permit him to argue that Martinez had tremendous motive, bias and prejudice. (*Id.*)

Tokley argues this exchange demonstrates that Griffith, a "Philadelphia attorney," did not know that a specific charge existed and was ineffective in failing to request it because without it the jury was free to give whatever weight it wished to Martinez's testimony.  (*Id.* 21–22.)  The accomplice charge instructs the jury to use "careful scrutiny" when evaluating the credibility of

accomplice testimony.  While Tokley makes much of this, the PCR Court and the Appellate Division concluded that it was clear that the entire trial turned on whether Martinez was a credible witness and the witness credibility charge was adequate in explaining how the jury should evaluate his testimony.  Thus "the jury was well aware that Martinez's credibility was central to the case and was the issue on which they needed to focus their attention."  (Pet'r's Habeas Petition, *State v. Tokley*, Appellate Division PCR Opinion, A-6536-05T4, Pa 47.) Without addressing whether Griffith committed a professional error sufficient to fulfill the first prong of *Strickland*, the Appellate Division concluded that Tokley was not prejudiced by the failure to request the charge.

Tokley has failed to demonstrate that the Appellate Division's conclusion was objectively unreasonable.  At the PCR hearing, when confronted with the model jury charge, Griffith explained that he believed the charge calling for careful scrutiny was "meaningless" because the general jury instructions actually told the jury to carefully scrutinize all witnesses. (Resp't's Br. App., Rta10 105:11–106:1.)  Moreover, in his closing argument at trial, Griffith explained to the jury the importance of evaluating Martinez's credibility:

> And the Judge is going to give you some instructions about credibility of witnesses, their motive to testify, their bias to testify, their prejudice against someone else to testify.  And I want you to really think about that because that is what this case is all about: Motive, bias, and prejudice.

(Resp't's Br. 58.)   The record shows that the trial was centered on issues of Martinez's credibility and that Griffith tailored his arguments and addressed the jury so as to bring Martinez's credibility to the forefront.  Tokley has not demonstrated that the Appellate Division was objectively unreasonable in concluding that he was not prejudiced by the failure to instruct the jury that their evaluation of Martinez required "careful scrutiny."   For prejudice to be

evidenced, "[t]he likelihood of a different result must be substantial, not just conceivable." *Harrington,* 131 S. Ct. at 792.  A substantial likelihood has not been demonstrated here.

### 3. Counsel's failure to cross-examine Martinez on certain inconsistent statements.

Tokley argues it was objectively unreasonable for the Appellate Division to conclude that Griffith's failure to cross-examine Martinez on certain inconsistent statements he made about Rosario's murder and the motive for the Quality Automobiles robbery did not amount to ineffective assistance of counsel.   Alternatively, Tokley argues there was a *Brady* violation if the state failed to provide Griffith with Martinez's prior inconsistent statements.

In connection with the police investigation of Rosario's murder, there were three taped statements in which Martinez claimed that he was *not* present when Rosario was killed. (Resp't's Br. 64; Pet'r's Habeas Petition, *State v. Tokley*, Appellate Division PCR Opinion, A-6536-05T4, Pa 45.)  At trial Griffith did not confront Martinez with these prior statements. (*Id.*)  But during his trial testimony, Martinez initially testified that when Rosario was murdered he was in the "Vroom Building" (presumably somewhere else).   Later on in his testimony, however, he contradicted himself and said that Tokley "killed [Rosario] in front of my face." (Resp't's Br. 64.)  At the PCR hearing Griffith testified that he did not have Martinez' prior statements or he otherwise would have confronted Martinez with them.  (Pet'r's Habeas Petition, *State v. Tokley*, Appellate Division PCR Opinion, A-6536-05T4, Pa 45–46.)   Griffith also testified that he wanted to avoid drawing too much attention to the murder during the trial so he kept his discussion of it to a minimum. (Resp't's Br. App., Rta11 183:1–184:9.)

The Appellate Division concluded that whether or not Griffith had Martinez's prior statements or whether he failed to use them was of no consequence because Martinez explicitly contradicted himself at trial. (Pet'r's Habeas Petition, *State v. Tokley*, Appellate Division PCR

Opinion, A-6536-05T4, Pa 46.)  Therefore, because the contradiction was plainly before the jury, the court found that Tokley had not been prejudiced, and Griffith's choice to avoid an in depth discussion of Rosario's death was a valid trial strategy.  The Appellate Division did not directly address Tokley's alternative theory that there had been a *Brady* violation.  This Court finds, however, that the thrust of the taped statements was the same contradiction that the Appellate Division found sufficiently exposed by Martinez's trial testimony.[2]

The Appellate Division further concluded that Tokley's claim that Griffith failed to cross-examine Martinez on other inconsistencies related to the motive for the robbery did not warrant discussion, citing to New Jersey Court Rule 2:11-3(e)(2), which states the Appellate Division may affirm the trial court's rulings on issues it believes to be without merit by stating the arguments and specifying this rule. (*Id.* at Pa 45.)  It noted that the PCR Court had found that Griffith had done a "thorough and effective job of cross-examining" Martinez. (*Id.* at Pa 37.)  The record supports the conclusion that Griffith effectively cross-examined Martinez and as respondent's brief suggests, minor inconsistencies in Martinez's statements as to why exactly Tokley may have participated in the robbery were unlikely to affect the jury's assessment of Martinez's credibility. Therefore, Tokley has failed to demonstrate that the Appellate Division unreasonably applied the *Strickland* standard in evaluating Griffith's cross-examination of Martinez.

#### 4.  Counsel's failure to request a *Bielkiewicz* instruction.

In his petition Tokley makes much of the fact that the Quality Automobiles robbery victims all testified that only one of the two men who committed the robbery brandished a gun. (Pet'r's Br. 33.)  Tokley argues that Griffith should have requested a *Bielkiewicz* charge, which

---

[2] Tokley fails to assert any facts in support of an actual *Brady* violation, leaving this an undeveloped theory that does not bear further examination.

instructs the jury that in cases of accomplice liability the specific intent of each participant must be ascertained because there could be different levels of culpability.  (Resp't's Br. 72–73; *State v. Bielkiewicz,* 267 N.J. Super 520, 528-534 (App. Div. 1993).)  Thus, if one participant in an armed robbery is unarmed and did not intend to engage in an armed robbery, he may only be guilty of the lesser second degree robbery offense despite the fact that his accomplice unexpectedly brandishes a weapon. (Pet'r's Br. 34.)

The Appellate Division rejected this argument as without merit by concluding that (1) Griffith had articulated a reasonable strategic reason for failing to request the charge; (2) the failure to request the charge made no difference in the outcome of the trial because Martinez had testified that both he and Tokley were armed; and (3) the victims' testimony had demonstrated that both robbers intended the gun to be used to intimidate them. (Pet'r's Habeas Petition, *State v. Tokley*, Appellate Division PCR Opinion, A-6536-05T4, Pa 46–47.)   During the PCR hearing Griffith explained that he had not asked for the charge because "it was inconsistent with his central trial strategy which was to convince the jury that Tokley was innocent of all charges," not guilty of a lesser charge.  (*Id.*)   Further, the Appellate Division pointed to the fact that the Quality Automobiles manager had testified that one robber told the other robber to "shoot" after the manager explained that there was no safe. (*Id.* at Pa 47 n.5.)  This testimony demonstrates that even if only one of the men brandished a weapon, both intended that it be used.

Tokley argues again that his Philadelphia-based lawyer was unfamiliar with New Jersey's *Bielkiewicz* charge, making his failure to request it an error.  But Griffith's PCR testimony demonstrates that even if he had been unaware of the charge, he was certainly aware that he could have requested that a lesser-included charge be given and chose not to do so because it was not the way he was framing the defense. (Resp't's Br. 74.)  The Appellate Division concluded

18

that Griffith did not commit professional error, and had made a strategic decision not to have the jury charged with lesser included offenses.  The court also concluded that there was no prejudice in light of the testimony of the victims and Martinez, because it demonstrated that both participants in the robbery intended the firearm to be used; thus, an instruction that each could be held to different levels of culpability based on their specific intent would have been fruitless. In so doing, the Appellate Division did not unreasonably apply the *Strickland* standard.

### 5.   Counsel's failure to object to the admission of hearsay evidence.

Finally, Tokley argues that Griffith failed to object to the admission of hearsay evidence that was the State's only means by which to demonstrate a motive for the robbery. (Pet'r's Br. 37.)  At trial, Martinez told the jury that Tokley was forcing Rosario to participate in the Quality Automobiles robbery to repay a debt.  (*Id.*)  When he began to testify as to what Rosario told him about the debt owed to Tokley, Griffith objected on hearsay grounds.  (*Id.* at 38.)  When the prosecutor started to explain that the hearsay statements were covered by an exception because Rosario was unavailable, Griffith withdrew his objection. (*Id.*)  Martinez then went on to testify about the debt Rosario owed Tokley, how Rosario's participation in the robbery was supposed to be a repayment of the debt, and how Martinez agreed to stand in for Rosario to help him out. (*Id.*)

Tokley argues that it was an error to permit the statements into evidence because it was the only means by which the State could establish Tokley's motive, and Griffith should have objected. But it is unclear whether the statements would have stayed out if Griffith maintained his objection.  The prosecutor was in the midst of explaining why a hearsay exception should permit the statements to come into evidence when Griffith chose to withdraw his objection.  It is certainly plausible that had Griffith maintained his objection, the Court would overrule it based

on the prosecutor's argument.  Moreover, Griffith testified that he believed the hearsay statements did not hurt Tokley but rather hurt Martinez's credibility, because it did not make sense that Tokley would commit a robbery to repay himself.  (Pet'r's Habeas Petition, *State v. Tokley*, Appellate Division PCR Opinion, A-6536-05T4, Pa 47.)  The Appellate Division agreed: "[h]aving reviewed the original transcript, we conclude that this was a reasonable trial strategy, particularly because Martinez's somewhat rambling explanation on this point would likely have hurt rather than helped his credibility." (*Id.* at Pa 47–48.)

The Appellate Division reasonably applied *Strickland* to conclude that Griffith employed a valid trial strategy and did not commit professional error in permitting the introduction of the hearsay statements.

As stated above, the standard of review on a § 2254 petition is particularly deferential and "doubly so" when evaluating a state court's application of *Strickland*.  *See Harrington,* 131 S. Ct. at 78.  That this court, or any other, may disagree with the state court's decision or could have independently reached a different result is not reason enough to grant habeas relief.  *See Werts, 228* F.3d at 197.   Where "fairminded jurists could disagree" the state court decision must be affirmed.  Tokley has not met his burden of demonstrating that the Appellate Division objectively unreasonably applied the Supreme Court's *Strickland* standard in evaluating his ineffective assistance of counsel claims.

### B.   *Violation of Due Process and Right to a Fair Trial*

In one paragraph, Tokley argues that he was deprived of due process and a fair trial because the trial court failed to grant a mistrial, issued an inadequate limiting instruction after Martinez burst out that Tokley murdered Rosario, and permitted the admission of improper other crimes evidence.  Therefore, he argues, the Appellate Division's affirmance of that decision on

direct appeal was contrary to the Supreme Court precedent in *Boyde v. California*, 494 U.S. 370, 380 (1990).  (Pet'r's Br. 39–40.)

 As stated above, a state court decision is "contrary to" clearly established federal law only if it "contradicts the governing law set forth in [the Supreme Court's] cases," or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a [different] result." *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000).  Clearly established law "refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412. Notably, "a state court's resolution of a question that the Supreme Court has not resolved" cannot be contrary to the Court's precedent. *Rountree,* 640 F.3d at 537. *See also Thomas v. Carroll*, 581 F.3d 118, 124 (3d Cir. 2009) (finding state court's determination was not contrary to federal law, as required for habeas relief, where Supreme Court never faced the precise issue presented in the case).

 Here, Tokley argues that although the trial court gave a limiting instruction immediately after Martinez's unexpected accusation that Tokley murdered Rosario, the Appellate Division's determination that the instruction was adequate was contrary to clearly established federal law because "there is a 'reasonable likelihood' that the jury would have concluded that the judge had authorized the use of propensity evidence," and evidence that Tokley murdered Rosario is so prejudicial that a jury "could not help but have issues of propensity and bad character influence its decision." (*Id.* at Pa 40.)  The federal law to which Tokley refers is the standard the Supreme Court announced in *Boyde*, ie. "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." 494 U.S. at 380.

Tokley does not explain how the Appellate Division's affirmance of the trial court's decision is "contrary to" this precept, how the *Boyde* standard applies to the curative instruction offered here, or what constitutionally relevant evidence the instruction may have prevented the jury from considering. Moreover, the *Boyde* decision and its "reasonable likelihood" standard apply specifically to challenges to jury instructions and verdict slips used *at the penalty stage of capital cases*. *See id.*

> In affirming Tokley's conviction, the Appellate Division applied New Jersey law:
>
> The determination whether to grant a mistrial "rests within the sound discretion of the trial court" and must be upheld on appeal unless there is a "clear showing that the court abused its discretion or that the defendant suffered actual harm." *State v. Labrutto*, 144 N.J. 187, 207 (1989). An appellate court extends substantial deference to a trial court's determination whether to grant a mistrial because "[t]he decision on whether inadmissible evidence is of such a nature as to be susceptible of being cured by a cautionary or limiting instruction, or instead requires the more severe response of a mistrial, is one that is peculiarly within the competence of the trial judge, who has the feel of the case and is best equipped to gauge the effect of a prejudicial comment on the jury in the overall setting." *State v. Winter*, 96 N.J. 540, 646–47 (1984).

(Pet'r's Br. App., *State of New Jersey v. Tokley,* Appellate Division, Docket No. A-4725-99T4, Ba 7.)

The Appellate Division concluded that the trial court had not abused its discretion in denying the request for mistrial and granting the limiting instruction because (1) Martinez's statement "was not responsive to the prosecutor's question, and there is no reason to believe the prosecutor attempted to elicit such testimony"; (2) "the trial judge carefully weighed the testimony in light of the prejudice to the defendant as well as the potential to demonstrate the bias and hostility of the witness against the defendant"; and (3) the "judge's curative instruction to the jury made clear the jury could only use the comment to assess Martinez's credibility, and the jury should not consider whether the statement is true or not." (*Id.* at Ba 7–8.)

With respect to the admission of other crimes evidence, the Appellate Division again looked to New Jersey law, noting that under N.J.R.E. 404(b) and *State v. Marerro,* 148 N.J. 469, 495 (1999), "the jury should be instructed as to the limited purpose of the evidence and the restricted significance they can attach to it." (*Id.* at Ba 9.)   The Appellate Division concluded that "the trial judge clearly instructed the jury on the permitted and prohibited purpose for the other-crimes evidence involving the statement that defendant murdered Rosario." (*Id.*) And although the trial judge "failed to give a similar instruction with regard to the reference to defendant's drug connection," the Appellate Division was satisfied that "the jury understood that it was not to decide whether the defendant was involved in drugs, but whether he committed the robbery at Quality Auto," and that "the defendant's drug connection was fleeting and clearly not a focus of the trial." (*Id.* at Ba 9–10.)   It therefore concluded that the error was harmless because it "did not cause the jury to reach a verdict it would not otherwise have reached." (*Id.* at Ba 10.)

Although the Appellate Division did not consider federal law when addressing Tokley's appeal, the decision still receives AEDPA deference because the AEDPA "does not require citation of [Supreme Court] cases—indeed, it does not even require awareness of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002).   Other than *Boyde*, which arises in a different context, Tokley has not pointed to any clearly established federal precedent which the Appellate Division's decision is "contrary to."

In its affirmance opinion, the Appellate Division did not address Tokley's constitutional claims head on, but rather satisfied itself that the trial court's rulings did not run afoul of the rules of evidence and thereby implied that the admission of the murder testimony and other crimes evidence and the failure to grant a mistrial was not "devastating" to Tokley's right to a

fair trial and due process. *See Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987) ("[w]e normally presume that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it, unless there is an "overwhelming probability" that the jury will be unable to follow the court's instructions, *Richardson v. Marsh*, 481 U.S. 200, 208 (1987), and a strong likelihood that the effect of the evidence would be "devastating" to the defendant, *Bruton v. United States*, 391 U.S. 123, 136 (1968).")  To give Tokley his due on those points, it must be remembered that only Martinez put Tokley at the scene of the crime, so his testimony and the issue of credibility was paramount.  And when the trial court told the jury that it could only use Martinez's murder accusation as supporting Martinez's declared hatred of Tokley, an argument could be made that the jury was being invited to credit the murder accusation.  However, the courts below saw the issues differently and reasonably explained why.  Indeed, the trial court twice gave precise instructions on the limitation of the murder accusation testimony.  On the above analysis, this Court cannot find that the decision to deny a mistrial was devastating to Tokley's right to a fair trial and the Appellate Division's affirmance contrary to clearly established federal law. Therefore, pursuant to the AEDPA Tokley is not entitled to relief.  *See* 28 U.S.C. § 2254(d).

## IV. Certificate of Appealability

Pursuant to 28 U.S.C. § 2253(c), no appeal may be taken from a final order in a proceeding under 28 U.S.C. § 2254 unless a circuit justice or judge issues a certificate of appealability, which may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his

constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller–El v. Cockrell,* 537 U.S. 322, 327 (2003).

While this Court will not grant habeas corpus relief, it nevertheless finds that Tokley has made a substantial showing that his constitutional rights may have been violated by trial rulings that bear upon the jury's assessment of Martinez's testimony (specifically, the denial of a mistrial and the content of the limiting instruction), and his lawyer's failure to call his sister and his mother to provide countervailing testimony to Martinez's claim that Tokley was his accomplice.  The Court is satisfied that these issues, which correspond to claims one and six of Tokley's petition, are adequate to deserve further review, and as to them a certificate of appealability will issue.

### V.  Conclusion

For the foregoing reasons, Tokley's petition is denied.  A certificate of appealability will issue as to claims one and six.  An appropriate order will be entered.


January 19th, 2012                          /s/ Katharine S. Hayden
                                         Katharine S. Hayden, U.S.D.J.